IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM A. MORGAN, JR., P.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 05-CV-1561 JR |
| | ) | |
| SUSAN WISWELL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT ANGELA MURPHY'S ANSWER AND COUNTERCLAIM

Pursuant to Fed. R. Civ. Proc. 7 to 15, Defendant and Counterclaim Plaintiff Angela Murphy ("Defendant Murphy" or "Murphy") hereby answers the Complaint filed by Plaintiff and Counterclaim Defendant William A. Morgan, Jr., P.C. ("Plaintiff" or "Morgan"), responding to Plaintiff's allegations in the Complaint and raising the defenses and counterclaim set forth below:

## I. RESPONSES TO THE SPECIFIC ALLEGATIONS IN THE COMPLAINT

### NATURE OF THE ACTION

1.      Defendant Murphy admits the allegations in paragraph 1 of the Complaint.

2.      Defendant Murphy admits that she and Defendant Wiswell are former employees of Plaintiff.  Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the remaining averments made in paragraph 2 of the Complaint and thus these allegations are denied.

3.      Defendant Murphy denies the allegations set forth in paragraph 3 of the Complaint.

4.      Defendant Murphy denies the allegations set forth in paragraph 4 of the Complaint.

5.      Defendant Murphy denies the allegations set forth in paragraph 5 of the Complaint.

## JURISDICTION AND VENUE

6.      Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 6 of the Complaint and thus the same are denied. Since objections to subject matter jurisdiction can and must be raised at any time, she will supplement her response to this allegation if she later learns that subject matter jurisdiction in this Court is inappropriate.

7.      Defendant Murphy admits the allegations in paragraph 7 of the Complaint.

## THE PARTIES

8.      Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 8 of the Complaint and thus the same are denied.

9.      Defendant Murphy admits the allegations in paragraph 9 of the Complaint.

10.      Defendant Murphy admits the allegations in paragraph 10 of the Complaint.

11.      Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 11 of the Complaint and thus the same are denied.

## MORGAN'S BUSINESS OPERATIONS

12.      Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 12 of the Complaint concerning Ms. Wingate's primary responsibilities and thus the same are denied.  Defendant Murphy admits the remaining allegations in paragraph 12 of the Complaint.

13.      Defendant Murphy admits that Plaintiff uses an e-mail system.  However, she is without sufficient knowledge or information to form a belief as to the truth of the technical aspects of the software, described in paragraph 13; accordingly those allegations are denied.  Defendant

Murphy also admits that Plaintiff had policies and procedures for its employees but denies Plaintiff's description, characterization and interpretation of the policy. Defendant Murphy denies all other allegations contained in paragraph 13 of the Complaint which are not specifically admitted herein.

14.    Defendant Murphy admits that Plaintiff uses passwords for its computers, but denies that the passwords used by Morgan were kept secret. She is without sufficient knowledge or information to form a belief as to the truth of the technical aspects of the software; accordingly those allegations are denied. Defendant Murphy denies all other allegations contained in paragraph 14 of the Complaint which are not specifically admitted herein.

15.    Defendant Murphy is without sufficient information or knowledge to form a belief as to the truth of the averments made in paragraph 15, and thus the same are denied.

16.    Defendant Murphy admits that she was given Ms. Wingate's password by Ms. Wingate and authorized by Ms. Wingate to use it. Defendant Murphy denies that she had access to the passwords of every Morgan employee. Defendant Murphy is without sufficient knowledge or information to form a belief as to the remaining averments made in paragraph 16 of the Complaint and thus the same are denied.

17.    Defendant Murphy admits the allegations in paragraph 17 of the Complaint.

18.    Defendant Murphy admits the allegations in paragraph 18 of the Complaint.

19.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 19 of the Complaint and thus the same are denied.

20.    Defendant Murphy admits that on June 16, 2005, she verbally informed Mr. Morgan and Ms. Wingate that she would no longer be working with Morgan effective two weeks from that date. Defendant Murphy denies Plaintiff's characterization of the conversation. Defendant Murphy

admits that Mr. Morgan asked her if she would continue her employment through August 15, 2005 and that she declined to do so. Defendant Murphy denies Plaintiff's characterization of that conversation; in fact, Defendant Murphy was constructively terminated by Plaintiff. Plaintiff had time to find a replacement for Defendant Murphy and in fact had interviewed, tested and could have hired a qualified applicant but failed to do so because of her race. Despite the fact that Plaintiff's actions forced Defendant Murphy to leave, Defendant Murphy offered to come in on weekends and be available by telephone to help Plaintiff. She stated she would do whatever she could to make the transition easier for them. Defendant Murphy denies all other allegations contained in paragraph 20 of the Complaint which are not specifically admitted herein.

21.    Defendant Murphy admits that on June 17, 2005 she arrived for work at Plaintiff's offices. Defendant Murphy admits that she cleaned out her personal effects from her office on June 17, 2005 before noon and left Plaintiff detailed instructions on servicing a large client as well as her office key, her ladies' room key and a post-it note stating she would mail the parking pass and building pass. Upon Defendant Murphy's arrival at work on June 17, 2005, she was being given the silent treatment. Office Manager, Natasha Lamb went out of her way to avoid contact with Defendant Murphy, and many of Defendant Murphy's permissions within the time and billing system had been removed. Defendant Murphy denies all other allegations contained in paragraph 21 of the Complaint which are not specifically admitted herein.

## DEFENDANTS' WRONGFUL ACTS

Defendant Murphy denies that the allegations identified under the heading "Defendants' Wrongful Acts" were wrongful.

22.    Defendant Murphy is without sufficient knowledge or information to form a belief

as to the truth of the averments made in paragraph 22 of the Complaint and thus the same are denied.

23.    Defendant Murphy denies the allegations in paragraph 23 of the Complaint.

24.    Defendant Murphy denies the allegations in paragraph 24 of the Complaint.

25.    Defendant Murphy admits that June 17, 2005 was her last day at Plaintiff's office. Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the remaining averments made in paragraph 25 of the Complaint and thus the same are denied.

26.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 26 of the Complaint and thus the same are denied.

27.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 27 of the Complaint and thus the same are denied.

28.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 28 of the Complaint and thus the same are denied.

29.    Defendant Murphy denies the allegations set forth in paragraph 29 of the Complaint regarding Defendant Murphy or her actions.  Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the remaining averments made in paragraph 29 of the Complaint and thus the same are denied.

30.    Defendant Murphy denies the allegations set forth in paragraph 30 of the Complaint regarding Defendant Murphy or her actions.  Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the remaining averments made in paragraph 30 of the Complaint and thus the same are denied.

31.    Defendant Murphy denies the allegations set forth in paragraph 31 of the Complaint regarding Defendant Murphy or her actions.  Defendant Murphy is without sufficient knowledge or

information to form a belief as to the truth of the remaining averments made in paragraph 31 of the Complaint and thus the same are denied.

32.    Defendant Murphy denies the allegations set forth in paragraph 32 of the Complaint regarding Defendant Murphy or her actions.  Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the remaining averments made in paragraph 32 of the Complaint and thus the same are denied.

33.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 33 of the Complaint and thus the same are denied.

34.    Defendant Murphy denies the allegations set forth in paragraph 34 of the Complaint regarding Defendant Murphy or her actions.  Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the remaining averments made in paragraph 34 of the Complaint and thus the same are denied.

35.    Defendant Murphy denies the allegations set forth in paragraph 35 of the Complaint regarding Defendant Murphy or her actions.  Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the remaining averments made in paragraph 35 of the Complaint and thus the same are denied.

36.    Defendant Murphy denies the allegations set forth in paragraph 36 of the Complaint.

37.    Defendant Murphy denies the allegations set forth in paragraph 37 of the Complaint. Additionally, Defendant Murphy states that Plaintiff's actions forced Defendant Murphy to leave her employment and constitute constructive termination.

38.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 38 of the Complaint and thus the same are denied.

39.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 39 of the Complaint and thus the same are denied.

40.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 40 of the Complaint and thus the same are denied.

41.    Defendant Murphy denies the allegations set forth in paragraph 41 of the Complaint.

## COUNT I

42.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

43.    Defendant Murphy is without sufficient knowledge or information to form a belief as to the truth of the averments made in paragraph 43 of the Complaint and thus the same are denied.

44.    Defendant Murphy denies the allegations set forth in paragraph 44 of the Complaint.

45.    Defendant Murphy denies the allegations set forth in paragraph 45 of the Complaint.

46.    Defendant Murphy denies the allegations set forth in paragraph 46 of the Complaint.

47.    Defendant Murphy denies the allegations set forth in paragraph 47 of the Complaint.

48.    Defendant Murphy denies the allegations set forth in paragraph 48 of the Complaint.

49.    Defendant Murphy denies the allegations set forth in paragraph 49 of the Complaint.

## COUNT II

50.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

51.    Defendant Murphy denies the allegations set forth in paragraph 51 of the Complaint.

52.    Defendant Murphy denies the allegations set forth in paragraph 52 of the Complaint.

53.    Defendant Murphy denies the allegations set forth in paragraph 53 of the Complaint.

54.    Defendant Murphy denies the allegations set forth in paragraph 54 of the Complaint.

## COUNT III

55.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

56.    Defendant Murphy denies the allegations set forth in paragraph 56 of the Complaint.

57.    Defendant Murphy denies the allegations set forth in paragraph 57 of the Complaint.

58.    Defendant Murphy denies the allegations set forth in paragraph 58 of the Complaint.

59.    Defendant Murphy denies the allegations set forth in paragraph 59 of the Complaint.

60.    Defendant Murphy denies the allegations set forth in paragraph 60 of the Complaint.

61.    Defendant Murphy denies the allegations set forth in paragraph 61 of the Complaint.

## COUNT IV

62.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

63.    Defendant Murphy denies the allegations set forth in paragraph 63 of the Complaint.

64.    Defendant Murphy denies the allegations set forth in paragraph 64 of the Complaint.

65.    Defendant Murphy denies the allegations set forth in paragraph 65 of the Complaint.

66.    Defendant Murphy denies the allegations set forth in paragraph 66 of the Complaint.

## COUNT V

67.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

68.    Defendant Murphy denies the allegations set forth in paragraph 68 of the Complaint.

69.    Defendant Murphy denies the allegations set forth in paragraph 69 of the Complaint.

70.    Defendant Murphy denies the allegations set forth in paragraph 70 of the Complaint.

71.    Defendant Murphy denies the allegations set forth in paragraph 71 of the Complaint.

72.    Defendant Murphy denies the allegations set forth in paragraph 72 of the Complaint.

## COUNT VI

73.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

74.    Defendant Murphy denies the allegations set forth in paragraph 74 of the Complaint.

75.    Defendant Murphy denies the allegations set forth in paragraph 75 of the Complaint.

76.    Defendant Murphy denies the allegations set forth in paragraph 76 of the Complaint.

77.    Defendant Murphy denies the allegations set forth in paragraph 77 of the Complaint.

78.    Defendant Murphy denies the allegations set forth in paragraph 78 of the Complaint.

## COUNT VII

79.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

80.    Defendant Murphy denies the allegations set forth in paragraph 80 of the Complaint.

81.    Defendant Murphy denies the allegations set forth in paragraph 81 of the Complaint.

82.    Defendant Murphy denies the allegations set forth in paragraph 82 of the Complaint.

83.    Defendant Murphy denies the allegations set forth in paragraph 83 of the Complaint.

84.    Defendant Murphy denies the allegations set forth in paragraph 84 of the Complaint.

85.    Defendant Murphy denies the allegations set forth in paragraph 85 of the Complaint.

86.    Defendant Murphy denies the allegations set forth in paragraph 86 of the Complaint.

87.    Defendant Murphy denies the allegations set forth in paragraph 87 of the Complaint.

## COUNT VIII

88.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

89.    Defendant Murphy denies the allegations set forth in paragraph 89 of the Complaint.

90.    Defendant Murphy denies the allegations set forth in paragraph 90 of the Complaint.

91.    Defendant Murphy denies the allegations set forth in paragraph 91 of the Complaint.

92.    Defendant Murphy denies the allegations set forth in paragraph 92 of the Complaint.

93.    Defendant Murphy denies the allegations set forth in paragraph 93 of the Complaint.

94.    Defendant Murphy denies the allegations set forth in paragraph 94 of the Complaint.

95.    Defendant Murphy denies the allegations set forth in paragraph 95 of the Complaint.

## COUNT IX

96.    Defendant Murphy incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

97.    Defendant Murphy denies the allegations set forth in paragraph 97 of the Complaint.

98.    Defendant Murphy denies the allegations set forth in paragraph 98 of the Complaint.

99.    Defendant Murphy denies the allegations set forth in paragraph 99 of the Complaint.

100.    Defendant Murphy denies the allegations set forth in paragraph 100 of the Complaint.

## II.  AFFIRMATIVE DEFENSES

### FIRST DEFENSE

101.    The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

102.    Plaintiff's claims are barred by statute of limitations and/or laches.

10

## THIRD DEFENSE

103.    Plaintiff's claims are barred by set off, offset and/or recoupment.  See Defendant Murphy's Counterclaim *infra*.

## FOURTH DEFENSE

104.    To the extent any damages have been caused to Plaintiff, the damage was caused by either the intentional and/or negligent conduct of plaintiffs and/or third parties.

## FIFTH DEFENSE

105.    Plaintiff's claims are barred by contributory negligence.

## SIXTH DEFENSE

106.    Plaintiff's claims are barred by voluntary assumption of the risk.

## SEVENTH DEFENSE

107.    Plaintiff's claims are barred by its own breaches and anticipatory breaches of contract.

## EIGHT DEFENSE

108.    Plaintiff's claims are barred by estoppel and/or waiver.

## NINTH DEFENSE

109.    Plaintiff's claims are barred in whole or in part by accord and satisfaction and release.

## TENTH DEFENSE

110.    Plaintiff's claims are barred by consent and/or license.

## ELEVENTH DEFENSE

111.    Plaintiff's claims are barred by duress.

## TWELFTH DEFENSE

112.    Plaintiff's claims are barred by their own fraud and/or illegality.

## THIRTEENTH DEFENSE

113.    Defendant Murphy reserves the right to supplement her defenses.

WHEREFORE, having fully answered the Complaint and shown cause why the relief should be denied, Defendant Murphy respectfully requests:

A.    That this Honorable Court pass an Order dismissing this case and requiring Plaintiff to pay all costs and attorneys' fees for this proceeding.

B.    And for such other and further relief as the nature of its cause may require.

## III.  COUNTERCLAIM

### THE PARTIES

114.    Counterclaim Defendant William A. Morgan, Jr., P.C. ("Morgan") is a professional corporation organized and existing under the laws of the District of Columbia with a principal place of business located at 4910 Massachusetts Ave., NW, #10, Washington, DC 20016.

115.    Counterclaim Plaintiff Angela Murphy ("Murphy") resides at 4028 Manheim Court, Jefferson, MD 21755.

### JURISDICTION AND VENUE

116.    This court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1332, 1337, 1343 and 1367.

117.    Venue in this judicial district is proper under 28 U.S.C. §1391.

118.    Defendant Morgan is a CPA firm providing accounting and tax services to individuals and business in the metropolitan DC area.  William A. Morgan, Jr. is the President and Merritt Wingate is the Vice President of Morgan.

## BACKGROUND FACTS TO ALL COUNTS

119.    Ms. Murphy was employed with Morgan for over six and one-half years. When her employment commenced in September, 1998, she was a receptionist and her hours were 9:00 a.m. to 5:00 p.m. At approximately the end of her first year, she was promoted to office manager. Mr. Morgan and Ms. Wingate mentioned that it was possible for her to work other hours as she was no longer tied to the telephones. Ms. Murphy took them up on the offer, and her hours were set at 8:30 a.m. to 4:30 p m.

120.    In June 2002, Ms. Murphy was promoted to the position of bookkeeper. Her office hours continued to be 8:30 a.m. to 4:30 p.m.

121.    Every year thereafter at her review, Mr. Morgan asked Ms. Murphy how her commute was and whether she needed to change her hours. In the Fall of 2004, during her annual review with Mr. Morgan, Ms. Murphy expressed that her commute was getting worse and that she would like to change her hours to 8:00 a.m. to 4:00 p.m. Mr. Morgan said that was fine. Ms. Murphy appreciated the change. She lives in Frederick County and even with the change, was spending at least three hours a day driving to and from work. Morgan's offices are approximately one and one-half miles from the nearest Metro station, thereby eliminating public transit as an option.

122.    Ms. Murphy was hired at a salary of $25,000. After her first year of employment, her salary was increased to $30,000; in subsequent years, her salary was increased to $35,000, then to $38,500, then to $41,000, then to $45,000 and finally to $50,000.

123.    During the course of Ms. Murphy's employment with Morgan, approximately 30 people were hired and subsequently left Morgan's employ. Ms. Murphy observed that very few employees, if any, left on good terms. Typically, the terminations or forced resignations occurred

after a meeting with Mr. Morgan and/or Ms. Wingate, and the employee departed without working a two week, or any, notice period.

124.    A noticeable pattern developed before many of the employee departures. Mr. Morgan and Ms. Wingate began ostracizing the employee and generally treating him or her in an inhumane manner. Employee e-mails, both personal and work-related, were read without their knowledge. For a certain time period, Mr. Morgan had Ms. Murphy print and deliver to him e-mails of then employees, Joe Barrett and Zelda Pigford. Not long thereafter, Mr. Barrett and Ms. Pigford's employment with Morgan terminated.

125.    Mr. Morgan and Ms. Wingate spoke to and about the targeted employees in a derogatory manner. They derided employees for reasons such as their personal appearance, weight, sexual preference, age, race, height, hairline, clothing, the employee's spouse, national origin, and income level. Commonly known names around the office for employees, behind their backs, were "Fat Pat" for Pat Bernot, "Old Pat" for Pat Adad, "TPT" for the prior bookkeeper, Lisa Little which stood for trailer park trash and "short Ron" for Ron Busch, among others.

126.    Ms. Wingate commented that if they hired the job applicant for bookkeeper, they'd have to call her "Black Angela." Mr. Morgan and Ms. Wingate declared that Pat Adad's husband ran drugs for the mafia. In the presence of Ms. Murphy and other employees, they played and proceeded to mock, "Fat Pat's" emotional voice mail message in which she advised she was leaving Morgan's employ. They shared "Fat Pat's" e-mails with Ms. Wiswell and other employees as they laughed and badmouthed Pat Bernot. During their termination, or forced departure, of Angela Lovelace, a young and skilled but untrained employee, they told her she should consider a different line of work. They made fun of Kathleen Donaghy's weight, sexual preference and the vest she

14

wore.  They pronounced that she wore a tight vest so she didn't have to wear a bra.

127.    Ms. Wingate, in particular, regularly derided employees, both present and former, to other employees.  She told Ms. Murphy that Selena Reed was an idiot, that Jennifer Leibold was lazy and that Kathleen Donaghy's work product was bad.  Mr. Morgan told Ms. Murphy that Susan Wiswell was unprofessional and disrespectful.  Mr. Morgan remarked that former employee Teresa Kendrick got what she deserved in reference to an injury that her daughter suffered as a baby while in daycare, leaving the child brain damaged.

128.    Rather than terminating employees directly, Mr. Morgan and Ms. Wingate relentlessly picked on employees they wished to leave and made their lives miserable until the employee left. This was a firm practice instituted by Morgan to avoid paying unemployment compensation.  Mr. Morgan sent things back to "Old Pat" if a staple was not where he liked it or if a mailing label was out of line by the space of one letter.  Not long afterward, "Old Pat's" employment with Morgan ended.

129.    If the course of outrageous treatment was not successful in forcing the employee out the door, Mr. Morgan had what he called a "Come to Jesus" meeting with the employee.  During these meetings, Mr. Morgan and/or Ms. Wingate reviewed with the employee a long list of alleged deficiencies and gave the employee an impossible period of time in which to correct them.  Mr. Morgan joked about his "Come to Jesus" meetings and how they meant the end of employment with Morgan.  Indeed, employees rarely returned to Morgan's office after such a meeting.

130.    Although Ms. Wingate often did her badmouthing behind people's backs, Ms. Murphy is aware of the following comments made by Ms. Wingate about or to Ms. Murphy. Without having any business justification, Ms. Wingate told a subordinate employee, Mara Lederer,

that Ms. Murphy had problems with depression. Ms. Wingate stated to Ms. Murphy that she could almost be attractive when she tried. She disparaged Ms. Murphy for not wearing makeup. She disparaged Ms. Murphy's shoes. She told Ms. Murphy she was "so Midwestern" in such a tone that being Midwestern was clearly undesirable. Ms. Wingate, Mr. Morgan and Natasha Lamb all derided Ms. Murphy because she cried easily. Ms. Wingate disparaged Ms. Murphy for keeping notes in a client file concerning changes and corrections made on the prior year's tax information. Ms. Wingate stated that if Ms. Murphy were a good preparer, she wouldn't need to look at last year's file. At least two employees remarked to Ms. Murphy that Ms. Wingate talked to Ms. Murphy much more nastily than she did to anyone else. Mr. Morgan, Ms. Wingate and Natasha Lamb all teased Ms. Murphy that Mr. Morgan was going to want to see Ms. Murphy at 4:30 p.m. on Friday afternoon, a commonly understood euphemism for getting fired.

131.    Mr. Morgan and Ms. Wingate told Ms. Murphy how lucky she was to be working at the Morgan firm. They told her few jobs in the accounting field were available without having an accounting degree. They also told her that they overpaid her in light of her skills and qualifications. Consequently, Ms. Murphy feared losing her job as she believed she would have great difficulty finding a comparable job.

132.    While employed at Morgan, Ms. Murphy was not always paid overtime at the rate of time and one-half despite working more than forty hours per week. However, Ms. Murphy was not exempt from the payment of overtime wages. Additionally, Morgan failed to reimburse Ms. Murphy for certain work related expenses, such as Metro fares to client offices.

133.    On Monday, May 9, 2005, Morgan held its weekly employee meeting. Morgan's entire staff of approximately eight to nine employees was present. At the end of the meeting, Mr.

Morgan intimated that a number of employees were violating firm policy. Specifically, he said it had come to his attention that people were not adhering to the office's business hours of 9:00 a.m. to 5:00 p.m. Since Morgan's staff knew that Angela Murphy, Jennifer Leibold and Susan Wiswell arrived before 9:00 a.m., and left before 5:00 p.m., it was understood by them that these employees were the culprits. Because Murphy had express permission to work the hours that she did, she was publicly humiliated by Mr. Morgan's false and defamatory statement that she had broken his rules.

134. Immediately after the meeting, Ms. Murphy went to Mr. Morgan's office about his statement. She noted that the handbook said office hours were 9:00 a.m. to 5:00 p.m. unless other arrangements had been made, and she asked him if remembered her other arrangements. Despite the fact that Ms. Murphy had not worked from 9:00 a.m. to 5:00 p.m. since 1999, Mr. Morgan said no, he did not. She reminded Mr. Morgan that they had talked about it in her last review. He looked in her personnel file, which he did not show to her, and said there was nothing in there about hours.

135. Ms. Murphy was astonished by Mr. Morgan's failure to acknowledge their past agreement on office hours. She was deeply hurt by the implication that she was working in contravention of her designated hours for the past six years. Hurt but trying to remain calm, Ms. Murphy stated she was already spending three hours a day in the car and while she valued her work, she couldn't spend any more time in the car. She said that they should both start looking for other arrangements.

136. Mr. Morgan's insinuation in front of the entire office that Ms. Murphy had wantonly disregarded established work hours and his refusal to acknowledge her agreed upon work hours of 8:00 a.m. to 4:00 p.m. so upset Ms. Murphy that she did not eat until Thursday evening of that week. She also could not sleep and spent her days feeling tired from lack of rest. When she finally fell

17

asleep, she awoke to nightmares about work.  She experienced vomiting, diarrhea, constant nausea, loss of appetite, depression and uncontrollable fits of crying.  The following week she was scheduled to go on vacation and did so with her husband and parents-in-law.  Far from relaxing, she spent the entire week worrying about whether Morgan was trying to force her out as it had done to so many others, worrying about what nasty treatment Morgan had planned for her, worrying about what horrible falsehoods they would tell clients or employees about her and worrying about not being able to find a job.  Her physical symptoms continued.  In the course of fourteen days after May 9, 2005, Ms. Murphy lost eleven pounds.

137.    After May 9, Ms. Murphy began working from 9:00 a.m. to 5:00 p.m.  The commute took her approximately four hours a day, leaving her little time to spend with her husband, a fact that compounded her stress.  She returned to work after her vacation to learn that Jennifer Leibold had resigned because of the change in office hours.  Ms. Leibold, another distance commuter who was married with children, worked three days a week and initially thought the new hours would not apply to her because she was part-time.  Mr. Morgan and/or Ms. Wingate advised her that she too was expected to work 9:00 a.m. to 5:00 p.m. on the days she was scheduled to work.

138.    On May 25, 2005, Ms. Wingate came to talk to Ms. Murphy and asked her to wait a few weeks and said she would guarantee that they will return Ms. Murphy's hours to 8:00 a.m. to 4:00 p.m.  She also instructed Ms. Murphy not to tell any current employees about this conversation.  Ms. Wingate commented that Ms. Murphy had been so professional about the office hour change and thanked her several times for her professionalism.  This conversation left Ms. Murphy confused and more distraught.  She did not know if they were trying to force her out or were trying to force her friends, Susan Wiswell and Jennifer Leibold out and were using her as an involuntary accomplice

in their plan to do so.  Desiring to preserve her own job, Ms. Murphy did as instructed and did not tell Ms. Wiswell or Ms. Leibold of the conversation.  However, Ms. Murphy's anxiety was exacerbated by the thought that she might be helping Morgan terminate Ms. Wiswell and knowing she could do nothing to stop it.

139.    After the above mentioned conversation between Ms. Murphy and Ms. Wingate, Morgan decided to hire a second bookkeeper.  They asked Ms. Murphy to design a bookkeeping test and evaluate the candidate's performance.  Ms. Murphy did so.  The candidate, also named Angela, performed well on the test and possessed the proper qualifications for the job.  Ms. Murphy recommended that Morgan hire the candidate.

140.    Morgan did not hire the candidate, most likely because she is African American. When Ms. Murphy had been the office manager and was responsible for interviewing and making recommendations for the receptionist position, Mr. Morgan told her that if the candidates lived in South East D.C. or attended the University of the District of Columbia, Ms. Murphy shouldn't even call them, no matter what the qualifications on their resumes.  He said he was not going to have someone at the front desk speaking Ebonics.  The staff joked that Mr. Morgan didn't want anyone saying "Let me ax you a question."

141.    In early June, Morgan succeeded in forcing Ms. Wiswell to leave.

142.    On June 16, 2005, Ms. Murphy went to Mr. Morgan and Ms. Wingate and tendered her two week resignation notice.  She stated that after the manner in which the hours issue was handled, she didn't see how they could change her hours back without her becoming a pariah in the office.  They asked if her only reason for leaving was because of the hours.  She replied that was the main reason but there were some other things, although it would serve no good purpose to go into

19

them - she wanted to leave on good terms, she said.

143.    Ms. Wingate was livid that Ms. Murphy did not wish to expound upon her reasons. She pressured Ms. Murphy to share the other reasons, saying "I don't believe you don't respect us enough to tell us what is going on."  Ms. Murphy resisted but finally gave in and said she no longer trusted Mr. Morgan after his failure to acknowledge the agreement on her alternate office hours and she hadn't trusted Ms. Wingate for a long time.  Ms. Wingate, again excited and yelling, demanded to know why Ms. Murphy didn't trust her.  Ms. Murphy stated that she believed Ms. Wingate was reading her e-mails.  Ms. Murphy also said she hadn't trusted Ms. Wingate since Natasha Lamb's engagement party when she overheard Ms. Wingate, who was seated at the same table, badmouthing Ms. Murphy to Jennifer Leibold and her husband.  Mr. Morgan stated that no one in this office reads anyone else's e-mail, to which Ms. Murphy replied she knew that wasn't true because when she was office manager, he had her read other people's e-mail.  The meeting continued in this fashion, with Mr. Morgan more or less calmly trying to convince Ms. Murphy to stay and Ms. Wingate hysterically denying that she even has the ability to read Ms. Murphy's e-mail and yelling along the lines of "how dare you treat us this way."

144.    Ms. Wingate's yelling rampage went on for some time; the entire meeting lasted about forty minutes.  Finally, Mr. Morgan acknowledged that he could see Ms. Murphy had made up her mind although he didn't agree with her leaving.  He said, given the kind of work you do, we would like you to stay until August 15 (two months).  If you do, he said, "I will not give you a problem and I can guarantee Merritt won't give you a problem."  Ms. Murphy stated she could not stay that long, but she offered to come in on weekends and be available by telephone to help them. She stated she would do whatever she could to make the transition easier for them.  The meeting

20

ended, and Ms. Wingate, still livid, insisted on taking Ms. Murphy to her office to show her that she couldn't read her e-mails.

145.    The next day Ms. Murphy reported to work around 9:00 a.m. She quickly noticed that she was being given the silent treatment . She started up her computer and soon discovered that many of her permissions within the time and billing system had been removed. The office manager, Natasha Lamb went out of her way to avoid contact with Ms. Murphy.

146.    Based on Morgan's inhumane treatment, Ms. Murphy made the decision to terminate her employment that day. She typed up detailed directions on how to service Bockorny Petrizzo, a large client who occupied most of her work time. The directions included specific instructions on how to prepare the client's invoicing, payables, and how to track reclaimed expenses, among other items. Ms. Murphy cleaned out her desk and left her office key, her ladies' room key, the Bockorny Petrizzo directions and a post-it note stating she would mail the parking pass and building pass.

147.    Ms. Wingate's inflammatory handling of the June 16, 2005 meeting and Morgan's treatment of Ms. Murphy the next day compounded the emotional anguish that Ms. Murphy had been experiencing since May 9, 2005.

## COUNT I
### (Defamation)

148.    Defendant incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

149.    Mr. Morgan falsely stated that Ms. Murphy was violating firm policy/rules by arriving at work before 9:00 a.m. and leaving before 5:00 p.m.

150.    Mr. Morgan published this statement to his employees without privilege.

151.     Mr. Morgan knew that this statement was false when he made it based upon the explicit approval given to Ms. Murphy to work the hours that she did.  Nevertheless, he made these statements with the malicious intent to cause Ms. Murphy harm.

152.     As a result of this statement, Ms. Murphy's reputation was harmed.  After the meeting, the receptionist, Marci Vergillo commented that too many people were caught leaving early.  Employees in the office reduced or stopped their interaction with Ms. Murphy. Ms. Murphy also suffered emotional distress as a result of Morgan's efforts to publicly humiliate her.

WHEREFORE, Counterclaim Plaintiff Murphy demands judgment against Defendant Morgan in the amount of $100,000 compensatory damages and $300,000 punitive damages, plus interest, costs and attorneys fees.

## COUNT II
### (Intentional Infliction of Emotional Distress)

153.     Defendant incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

154.     Morgan committed extreme and outrageous conduct by forcing Ms. Murphy to change her work hours and then telling her coworkers that Ms. Murphy had violated company policy/rules by arriving at work before 9:00 a.m. and leaving before 5:00 p.m.  By changing her work hours, Morgan increased Ms. Murphy's commute time, depriving her of time to spend time with her husband.  This was devastating to Ms. Murphy.  Intensifying this negative impact to Ms. Murphy's mental state, Morgan took away Ms. Murphy's support in the office by making her coworkers think she had violated firm policy/rules, which further isolated her.

155.     In light of Morgan's past pattern of forcing employees to leave by treating them

cruelly and inhumanely, and the absence of any business need to change office hours, Morgan's sudden switch to strict 9:00 a.m. to 5:00 p.m. office hours was calculated to force one or more employees to leave.

156.    Ms. Wingate further compounded Morgan's extreme and outrageous conduct by later telling Ms. Murphy they would give her old hours back to her if she held on for a few weeks but that she couldn't tell any current employees this information.

157.    Morgan took these actions with the intent to cause Ms. Murphy severe emotional distress. Indeed, Mr. Morgan and Ms. Wingate knew that minimizing her commute and having time for her personal life were very important to Ms. Murphy. They knew that Ms. Murphy valued the opportunity to work flexible hours and that she more than capably accomplished her work within those hours. Moreover, Mr. Morgan and Ms. Wingate knew that changing Ms. Murphy's hours would not benefit the firm at all. Nevertheless, they changed Ms. Murphy's hours in a way which was calculated to punish Ms. Murphy emotionally through public humiliation.

158.    Ms. Wingate and Ms. Morgan knew that Ms. Murphy and Ms. Wiswell were friends. They knew they were not giving Ms. Wiswell the option of returning to her old hours. They knew that their offer to restore Ms. Murphy's old hours accompanied by their request that she not tell the other employees would cause Ms. Murphy severe emotional distress. Nevertheless, they used Ms. Murphy as an involuntary accomplice to force Ms. Wiswell's resignation in a way which was calculated to cause Ms. Murphy severe emotional distress.

159.    Ms. Murphy has in fact suffered severe emotional distress as a result of Morgan's actions. She did not eat for days after Mr. Morgan publicly humiliated her in front of her coworkers. She has vomited, lost sleep, lost her appetite, experienced nausea, diarrhea, depression, nightmares

and uncontrollable crying as a result of Morgan's tortious conduct.

WHEREFORE, Counterclaim Plaintiff Murphy demands judgment against Counterclaim Defendant Morgan in the amount of $100,000 compensatory damages and $300,000 punitive damages, plus interest, costs and attorneys fees.

## COUNT III
### (Fair Labor Standards Act Claim)

160.    Counterclaim Plaintiff incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

161.    Pursuant to 29 U.S.C. § 207, Morgan was obligated to pay Ms. Murphy not less than one and one-half times the regular rate at which she was compensated for any time she worked over forty hours in any given work week.

162.    Despite the fact that Ms. Murphy often worked more than forty hours a week, Morgan did not pay her time and a half for time worked by her in excess of forty hours.

163.    As a result of this violation, Ms. Murphy did not receive pay, including overtime pay, to which she was entitled.  Furthermore, she is entitled to liquidated damages and attorneys fees pursuant to 29 U.S.C. §216.

164.    Ms. Murphy has a right to bring an action in this Court to recover these wages, liquidated damages and her attorneys' fees and costs for bringing this action pursuant to 29 U.S.C. §216(b).

165.    Attached hereto as Exhibit A is Ms. Murphy's consent to this suit in accordance with 29 U.S.C. §216(b).

WHEREFORE, Counterclaim Plaintiff Murphy demands judgment against Counterclaim

Defendant Morgan in the amount of $50,000.00, plus interest, attorneys' fees and costs.

## COUNT IV
### (Claim Under D.C. Code Ann. §32-1308 and §32-1012)

166.    Counterclaim Plaintiff incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

167.    Pursuant to D.C. Code Ann. §32-1003(c), Morgan was obligated to pay Ms. Murphy not less than one and one-half times the regular rate at which she was compensated for any time she worked over forty hours in any given work week.

168.    Despite the fact that Ms. Murphy often worked more than forty hours a week, Morgan did not pay her time and a half for time worked by her in excess of forty hours.

169.    As a result of this violation, Ms. Murphy did not receive pay, including overtime pay, to which she was entitled.  Furthermore, she is entitled to liquidated damages, attorneys fees and costs pursuant to D.C. Code Ann. §§32-1012 and 32-1308.

170.    Ms. Murphy has a right to bring an action in this Court to recover these wages, liquidated damages and her attorneys' fees and costs for bringing this action pursuant to D.C. Code Ann. §§32-1012 and 32-1308.

171.    Attached hereto as Exhibit A is Ms. Murphy's consent to this suit in accordance with D.C. Code Ann. §§32-1012(b).

WHEREFORE, Counterclaim Plaintiff Murphy demands judgment against Counterclaim Defendant Morgan in the amount of $50,000.00, plus interest, attorneys' fees and costs.

Respectfully Submitted


/s/_____
Janice B. Rockwell, Esquire
U.S. District Court  for the District of Columbia
 Bar No. MD04814
121-A North Court Street
Frederick, MD 21705
Phone: (301) 631-0900
Fax: (301) 631-0997
Attorney for Defendant/Counterclaim Plaintiff


## **JURY DEMAND**

Defendant/Counterclaim Plaintiff demands a jury trial for all issues so triable.

## **CERTIFICATE OF SERVICE**

I HEREBY certify that on September 2, 2005, a copy of the foregoing was sent via first class

mail, postage prepaid and by facsimile to John Hornick, Esq.:  Finnegan, Henderson, Farabow,

Garrett & Dunner, L.L.P., 901 New York Ave., N.W., Washington D.C.  20001-4413 and to Roger

C. Simmons, Esquire and Victor E. Cretella, III, Esquire:  603B West Patrick Street, Frederick, MD

21705,

AND that on September 15, 2005, the aforegoing persons were served by the CM/ECF software.

AND that on September 15, 2005, a copy of the foregoing was sent via first class mail, postage

prepaid to Manesh K. Rath, Esq., Keller and Heckman, LLP, 1001 G. St., N.W., Suite 500 West,

Washington, D.C. 20001.


/s/_____
Janice B. Rockwell