**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILLIAM A. MORGAN, JR., P.C. )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>SUSAN WISWELL, *et al.*, )<br>)<br>    Defendants. )<br>_____ ) | Case No.: 05-CV-1561 JR |

### ANGELA MURPHY'S FIRST AMENDED COUNTERCLAIM

Pursuant to Fed. R. Civ. Proc. 7 to 15, Defendant and Counterclaim Plaintiff Angela Murphy ("Defendant Murphy" or "Murphy") hereby files this First Amended Counterclaim set forth below:

### THE PARTIES

1.    Counterclaim Defendant William A. Morgan, Jr., P.C. ("Morgan") is a professional corporation organized and existing under the laws of the District of Columbia with a principal place of business located at 4910 Massachusetts Ave., NW, #10, Washington, DC 20016.

2.    Counterclaim Plaintiff Angela Murphy ("Murphy") resides at 4028 Manheim Court, Jefferson, MD 21755.

### JURISDICTION AND VENUE

3.    This court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1332, 1337, 1343 and 1367.

4.    Venue in this judicial district is proper under 28 U.S.C. §1391.

5.    Defendant Morgan is a CPA firm providing accounting and tax services to individuals and business in the metropolitan DC area.  William A. Morgan, Jr. is the President and Merritt Wingate is the Vice President of Morgan.

## BACKGROUND FACTS TO ALL COUNTS

6.  Ms. Murphy was employed with Morgan for over six and one-half years. When her employment commenced in September, 1998, she was a receptionist and her hours were 9:00 a.m. to 5:00 p.m. At approximately the end of her first year, she was promoted to office manager. Mr. Morgan and Ms. Wingate mentioned that it was possible for her to work other hours as she was no longer tied to the telephones. Ms. Murphy took them up on the offer, and her hours were set at 8:30 a.m. to 4:30 p m.

7.  In June 2002, Ms. Murphy was promoted to the position of bookkeeper. Her office hours continued to be 8:30 a.m. to 4:30 p.m.

8.  Every year thereafter at her review, Mr. Morgan asked Ms. Murphy how her commute was and whether she needed to change her hours. In the Fall of 2004, during her annual review with Mr. Morgan, Ms. Murphy expressed that her commute was getting worse and that she would like to change her hours to 8:00 a.m. to 4:00 p.m. Mr. Morgan said that was fine. Ms. Murphy appreciated the change. She lives in Frederick County and even with the change, was spending at least three hours a day driving to and from work. Morgan's offices are approximately one and one-half miles from the nearest Metro station, thereby eliminating public transit as an option.

9.  Ms. Murphy was hired at a salary of $25,000. After her first year of employment, her salary was increased to $30,000; in subsequent years, her salary was increased to $35,000, then to $38,500, then to $41,000, then to $45,000 and finally to $50,000.

10. During the course of Ms. Murphy's employment with Morgan, approximately 30 people were hired and subsequently left Morgan's employ. Ms. Murphy observed that very few employees, if any, left on good terms. Typically, the terminations or forced resignations occurred

after a meeting with Mr. Morgan and/or Ms. Wingate, and the employee departed without working a two week, or any, notice period.

11. A noticeable pattern developed before many of the employee departures. Mr. Morgan and Ms. Wingate began ostracizing the employee and generally treating him or her in an inhumane manner. Employee e-mails, both personal and work-related, were read without their knowledge. For a certain time period, Mr. Morgan had Ms. Murphy print and deliver to him e-mails of then employees, Joe Barrett and Zelda Pigford. Not long thereafter, Mr. Barrett and Ms. Pigford's employment with Morgan terminated.

12. Mr. Morgan and Ms. Wingate spoke to and about the targeted employees in a derogatory manner. They derided employees for reasons such as their personal appearance, weight, sexual preference, age, race, height, hairline, clothing, the employee's spouse, national origin, and income level. Commonly known names around the office for employees, behind their backs, were "Fat Pat" for Pat Bernot, "Old Pat" for Pat Adad, "TPT" for the prior bookkeeper, Lisa Little which stood for trailer park trash and "short Ron" for Ron Busch, among others.

13. Ms. Wingate commented that if they hired the job applicant for bookkeeper, they'd have to call her "Black Angela." Mr. Morgan and Ms. Wingate declared that Pat Adad's husband ran drugs for the mafia. In the presence of Ms. Murphy and other employees, they played and proceeded to mock, "Fat Pat's" emotional voice mail message in which she advised she was leaving Morgan's employ. They shared "Fat Pat's" e-mails with Ms. Wiswell and other employees as they laughed and badmouthed Pat Bernot. During their termination, or forced departure, of Angela Lovelace, a young and skilled but untrained employee, they told her she should consider a different line of work. They made fun of Kathleen Donaghy's weight, sexual preference and the vest she wore. They pronounced that she wore a tight vest so she didn't have to wear a bra.

14.     Ms. Wingate, in particular, regularly derided employees, both present and former, to other employees. She told Ms. Murphy that Selena Reed was an idiot, that Jennifer Leibold was lazy and that Kathleen Donaghy's work product was bad. Mr. Morgan told Ms. Murphy that Susan Wiswell was unprofessional and disrespectful. Mr. Morgan remarked that former employee Teresa Kendrick got what she deserved in reference to an injury that her daughter suffered as a baby while in daycare, leaving the child brain damaged.

15.     Rather than terminating employees directly, Mr. Morgan and Ms. Wingate relentlessly picked on employees they wished to leave and made their lives miserable until the employee left. This was a firm practice instituted by Morgan to avoid paying unemployment compensation. Mr. Morgan sent things back to "Old Pat" if a staple was not where he liked it or if a mailing label was out of line by the space of one letter. Not long afterward, "Old Pat's" employment with Morgan ended.

16.     If the course of outrageous treatment was not successful in forcing the employee out the door, Mr. Morgan had what he called a "Come to Jesus" meeting with the employee. During these meetings, Mr. Morgan and/or Ms. Wingate reviewed with the employee a long list of alleged deficiencies and gave the employee an impossible period of time in which to correct them. Mr. Morgan joked about his "Come to Jesus" meetings and how they meant the end of employment with Morgan. Indeed, employees rarely returned to Morgan's office after such a meeting.

17.     Although Ms. Wingate often did her badmouthing behind people's backs, Ms. Murphy is aware of the following comments made by Ms. Wingate about or to Ms. Murphy. Without having any business justification, Ms. Wingate told a subordinate employee, Mara Lederer, that Ms. Murphy had problems with depression. Ms. Wingate stated to Ms. Murphy that she could

almost be attractive when she tried. She disparaged Ms. Murphy for not wearing makeup. She disparaged Ms. Murphy's shoes. She told Ms. Murphy she was "so Midwestern" in such a tone that being Midwestern was clearly undesirable. Ms. Wingate, Mr. Morgan and Natasha Lamb all derided Ms. Murphy because she cried easily. Ms. Wingate disparaged Ms. Murphy for keeping notes in a client file concerning changes and corrections made on the prior year's tax information. Ms. Wingate stated that if Ms. Murphy were a good preparer, she wouldn't need to look at last year's file. At least two employees remarked to Ms. Murphy that Ms. Wingate talked to Ms. Murphy much more nastily than she did to anyone else. Mr. Morgan, Ms. Wingate and Natasha Lamb all teased Ms. Murphy that Mr. Morgan was going to want to see Ms. Murphy at 4:30 p.m. on Friday afternoon, a commonly understood euphemism for getting fired.

18. Mr. Morgan and Ms. Wingate told Ms. Murphy how lucky she was to be working at the Morgan firm. They told her few jobs in the accounting field were available without having an accounting degree. They also told her that they overpaid her in light of her skills and qualifications. Consequently, Ms. Murphy feared losing her job as she believed she would have great difficulty finding a comparable job.

19. While employed at Morgan, Ms. Murphy was not always paid overtime at the rate of time and one-half despite working more than forty hours per week. However, Ms. Murphy was not exempt from the payment of overtime wages. Additionally, Morgan failed to reimburse Ms. Murphy for certain work related expenses, such as Metro fares to client offices.

20. On Monday, May 9, 2005, Morgan held its weekly employee meeting. Morgan's entire staff of approximately eight to nine employees was present. At the end of the meeting, Mr. Morgan intimated that a number of employees were violating firm policy. Specifically, he said it

had come to his attention that people were not adhering to the office's business hours of 9:00 a.m. to 5:00 p.m. Since Morgan's staff knew that Angela Murphy, Jennifer Leibold and Susan Wiswell arrived before 9:00 a.m., and left before 5:00 p.m., it was understood by them that these employees were the culprits. Because Murphy had express permission to work the hours that she did, she was publicly humiliated by Mr. Morgan's false and defamatory statement that she had broken his rules.

21. Immediately after the meeting, Ms. Murphy went to Mr. Morgan's office about his statement. She noted that the handbook said office hours were 9:00 a.m. to 5:00 p.m. unless other arrangements had been made, and she asked him if remembered her other arrangements. Despite the fact that Ms. Murphy had not worked from 9:00 a.m. to 5:00 p.m. since 1999, Mr. Morgan said no, he did not. She reminded Mr. Morgan that they had talked about it in her last review. He looked in her personnel file, which he did not show to her, and said there was nothing in there about hours.

22. Ms. Murphy was astonished by Mr. Morgan's failure to acknowledge their past agreement on office hours. She was deeply hurt by the implication that she was working in contravention of her designated hours for the past six years. Hurt but trying to remain calm, Ms. Murphy stated she was already spending three hours a day in the car and while she valued her work, she couldn't spend any more time in the car. She said that they should both start looking for other arrangements.

23. Mr. Morgan's insinuation in front of the entire office that Ms. Murphy had wantonly disregarded established work hours and his refusal to acknowledge her agreed upon work hours of 8:00 a.m. to 4:00 p.m. so upset Ms. Murphy that she did not eat until Thursday evening of that week. She also could not sleep and spent her days feeling tired from lack of rest. When she finally fell asleep, she awoke to nightmares about work. She experienced vomiting, diarrhea, constant nausea,

loss of appetite, depression and uncontrollable fits of crying. The following week she was scheduled to go on vacation and did so with her husband and parents-in-law. Far from relaxing, she spent the entire week worrying about whether Morgan was trying to force her out as it had done to so many others, worrying about what nasty treatment Morgan had planned for her, worrying about what horrible falsehoods they would tell clients or employees about her and worrying about not being able to find a job. Her physical symptoms continued. In the course of fourteen days after May 9, 2005, Ms. Murphy lost eleven pounds.

24. After May 9, Ms. Murphy began working from 9:00 a.m. to 5:00 p.m. The commute took her approximately four hours a day, leaving her little time to spend with her husband, a fact that compounded her stress. She returned to work after her vacation to learn that Jennifer Leibold had resigned because of the change in office hours. Ms. Leibold, another distance commuter who was married with children, worked three days a week and initially thought the new hours would not apply to her because she was part-time. Mr. Morgan and/or Ms. Wingate advised her that she too was expected to work 9:00 a.m. to 5:00 p.m. on the days she was scheduled to work.

25. On May 25, 2005, Ms. Wingate came to talk to Ms. Murphy and asked her to wait a few weeks and said she would guarantee that they will return Ms. Murphy's hours to 8:00 a.m. to 4:00 p.m. She also instructed Ms. Murphy not to tell any current employees about this conversation. Ms. Wingate commented that Ms. Murphy had been so professional about the office hour change and thanked her several times for her professionalism. This conversation left Ms. Murphy confused and more distraught. She did not know if they were trying to force her out or were trying to force her friends, Susan Wiswell and Jennifer Leibold out and were using her as an involuntary accomplice in their plan to do so. Desiring to preserve her own job, Ms. Murphy did as instructed and did not

tell Ms. Wiswell or Ms. Leibold of the conversation. However, Ms. Murphy's anxiety was exacerbated by the thought that she might be helping Morgan terminate Ms. Wiswell and knowing she could do nothing to stop it.

26.    After the above mentioned conversation between Ms. Murphy and Ms. Wingate, Morgan decided to hire a second bookkeeper. They asked Ms. Murphy to design a bookkeeping test and evaluate the candidate's performance. Ms. Murphy did so. The candidate, also named Angela, performed well on the test and possessed the proper qualifications for the job. Ms. Murphy recommended that Morgan hire the candidate.

27.    Morgan did not hire the candidate, most likely because she is African American. When Ms. Murphy had been the office manager and was responsible for interviewing and making recommendations for the receptionist position, Mr. Morgan told her that if the candidates lived in South East D.C. or attended the University of the District of Columbia, Ms. Murphy shouldn't even call them, no matter what the qualifications on their resumes. He said he was not going to have someone at the front desk speaking Ebonics. The staff joked that Mr. Morgan didn't want anyone saying "Let me ax you a question."

28.    In early June, Morgan succeeded in forcing Ms. Wiswell to leave.

29.    On June 16, 2005, Ms. Murphy went to Mr. Morgan and Ms. Wingate and tendered her two week resignation notice. She stated that after the manner in which the hours issue was handled, she didn't see how they could change her hours back without her becoming a pariah in the office. They asked if her only reason for leaving was because of the hours. She replied that was the main reason but there were some other things, although it would serve no good purpose to go into them - she wanted to leave on good terms, she said.

30. Ms. Wingate was livid that Ms. Murphy did not wish to expound upon her reasons. She pressured Ms. Murphy to share the other reasons, saying "I don't believe you don't respect us enough to tell us what is going on." Ms. Murphy resisted but finally gave in and said she no longer trusted Mr. Morgan after his failure to acknowledge the agreement on her alternate office hours and she hadn't trusted Ms. Wingate for a long time. Ms. Wingate, again excited and yelling, demanded to know why Ms. Murphy didn't trust her. Ms. Murphy stated that she believed Ms. Wingate was reading her e-mails. Ms. Murphy also said she hadn't trusted Ms. Wingate since Natasha Lamb's engagement party when she overheard Ms. Wingate, who was seated at the same table, badmouthing Ms. Murphy to Jennifer Leibold and her husband. Mr. Morgan stated that no one in this office reads anyone else's e-mail, to which Ms. Murphy replied she knew that wasn't true because when she was office manager, he had her read other people's e-mail. The meeting continued in this fashion, with Mr. Morgan more or less calmly trying to convince Ms. Murphy to stay and Ms. Wingate hysterically denying that she even has the ability to read Ms. Murphy's e-mail and yelling along the lines of "how dare you treat us this way."

31. Ms. Wingate's yelling rampage went on for some time; the entire meeting lasted about forty minutes. Finally, Mr. Morgan acknowledged that he could see Ms. Murphy had made up her mind although he didn't agree with her leaving. He said, given the kind of work you do, we would like you to stay until August 15 (two months). If you do, he said, "I will not give you a problem and I can guarantee Merritt won't give you a problem." Ms. Murphy stated she could not stay that long, but she offered to come in on weekends and be available by telephone to help them. She stated she would do whatever she could to make the transition easier for them. The meeting ended, and Ms. Wingate, still livid, insisted on taking Ms. Murphy to her office to show her that she couldn't read her e-mails.

9

32. The next day Ms. Murphy reported to work around 9:00 a.m. She quickly noticed that she was being given the silent treatment. She started up her computer and soon discovered that many of her permissions within the time and billing system had been removed. The office manager, Natasha Lamb went out of her way to avoid contact with Ms. Murphy.

33. Based on Morgan's inhumane treatment, Ms. Murphy made the decision to terminate her employment that day. She typed up detailed directions on how to service Bockorny Petrizzo, a large client who occupied most of her work time. The directions included specific instructions on how to prepare the client's invoicing, payables, and how to track reclaimed expenses, among other items. Ms. Murphy cleaned out her desk and left her office key, her ladies' room key, the Bockorny Petrizzo directions and a post-it note stating she would mail the parking pass and building pass.

34. Ms. Wingate's inflammatory handling of the June 16, 2005 meeting and Morgan's treatment of Ms. Murphy the next day compounded the emotional anguish that Ms. Murphy had been experiencing since May 9, 2005.

## COUNT I
### (Fair Labor Standards Act Claim)

35. Counterclaim Plaintiff incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

36. Pursuant to 29 U.S.C. § 207, Morgan was obligated to pay Ms. Murphy not less than one and one-half times the regular rate at which she was compensated for any time she worked over forty hours in any given work week.

37. Despite the fact that Ms. Murphy often worked more than forty hours a week, Morgan did not pay her time and a half for time worked by her in excess of forty hours.

38. As a result of this violation, Ms. Murphy did not receive pay, including overtime pay, to which she was entitled. Furthermore, she is entitled to liquidated damages and attorneys fees pursuant to 29 U.S.C. §216.

39. Ms. Murphy has a right to bring an action in this Court to recover these wages, liquidated damages and her attorneys' fees and costs for bringing this action pursuant to 29 U.S.C. §216(b).

40. Attached hereto as Exhibit A is Ms. Murphy's consent to this suit in accordance with 29 U.S.C. §216(b).

WHEREFORE, Counterclaim Plaintiff Murphy demands judgment against Counterclaim Defendant Morgan in the amount of $100,000.00, plus interest, attorneys' fees and costs.

## COUNT II
### (Claim Under D.C. Code Ann. §32-1308 and §32-1012)

41. Counterclaim Plaintiff incorporates each and every allegation set forth in this Answer and Counterclaim as if set forth herein.

42. Pursuant to D.C. Code Ann. §32-1003(c), Morgan was obligated to pay Ms. Murphy not less than one and one-half times the regular rate at which she was compensated for any time she worked over forty hours in any given work week.

43. Despite the fact that Ms. Murphy often worked more than forty hours a week, Morgan did not pay her time and a half for time worked by her in excess of forty hours.

44. As a result of this violation, Ms. Murphy did not receive pay, including overtime pay, to which she was entitled. Furthermore, she is entitled to liquidated damages, attorneys fees and costs pursuant to D.C. Code Ann. §§32-1012 and 32-1308.

45.	Ms. Murphy has a right to bring an action in this Court to recover these wages, liquidated damages and her attorneys' fees and costs for bringing this action pursuant to D.C. Code Ann. §§32-1012 and 32-1308.

46.	Attached hereto as Exhibit A is Ms. Murphy's consent to this suit in accordance with D.C. Code Ann. §§32-1012(b).

WHEREFORE, Counterclaim Plaintiff Murphy demands judgment against Counterclaim Defendant Morgan in the amount of $100,000.00, plus interest, attorneys' fees and costs.

Respectfully Submitted

/s/
Janice B. Rockwell, Esquire
U.S. District Court for the District of Columbia
Bar No. MD04814
121-A North Court Street
Frederick, MD 21705
Phone: (301) 631-0900
Fax: (301) 631-0997
Attorney for Defendant/Counterclaim Plaintiff

**JURY DEMAND**

Defendant/Counterclaim Plaintiff demands a jury trial for all issues so triable.

## CERTIFICATE OF SERVICE

I HEREBY certify that on March 2, 2006, the following persons were served by the CM/ECF software: John F. Hornick, Esquire and Timothy A. Lemper, Esquire, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., 901 New York Avenue, N.W., Washington D.C. 20001-4413, attorneys for Plaintiff; Manesh K. Rath, Esquire, Keller and Heckman, LLP, 1001 G Street, N.W., Suite 500 West, Washington, D.C. 20001, attorney for Plaintiff; and Roger C. Simmons, Esquire and Victor E. Cretella, III, Esquire, 603B West Patrick Street, Frederick, MD 21705, attorneys for Defendant/Counterclaim Plaintiff, Susan Wiswell.

/s/
Janice B. Rockwell

C:\Documents\word perfect\Server\WPDOCS\CLIENTS\MURPHY\DC District Court\First Amended Counterclaim 3-2-06.wpd